T.C. Memo. 2007-368


UNITED STATES TAX COURT


RHETT RANCE SMITH AND ALICE AVILA SMITH, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11902-05, 13225-05,    Filed December 17, 2007.
          13226-05, 13227-05,
          13228-05.


<u>Robert J. Stientjes</u>, <u>Thomas C. Pliske</u>, <u>Shine Lin</u>, and

<u>Anthony S. Gasaway</u>, for petitioners.

<u>Anne W. Durning</u>, <u>Nicholas J. Richards</u>, <u>Laura Beth Salant</u>,

and <u>Chris J. Sheldon</u>, for respondent.

---

[1] Cases of the following petitioners are consolidated
herewith for purposes of trial, briefing, and opinion:  Joel
Rance and LaRhea Smith, docket No. 13225-05; J. Zane and Shannon
R. Creese Smith, docket No. 13226-05; and Rhett Rance and Alice
Avila Smith, docket Nos. 13227-05 and 13228-05.  A pretrial
procedural issue was decided with respect to Rhett Rance and
Alice Avila Smith in docket No. 11902-05.  See <u>Smith v.
Commissioner</u>, T.C. Memo. 2006-187.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined the following income tax deficiencies and penalties with respect to petitioners in these consolidated cases:

| Petitioners | Year | Deficiency | Accuracy-Related Penalty Sec. 6662 |
|---|---|---|---|
| Rhett Rance & Alice Avila Smith | 1998 | $311,514 | $62,302.80 |
| | 1999 | 368,777 | 73,755.40 |
| | 2000 | 373,183 | 74,638.40 |
| | 2001 | 110,429 | 22,085.80 |
| | 2002 | 87,535 | None |
| Joel Rance & LaRhea Smith | 1998 | 988,392 | 197,678.40 |
| | 1999 | 1,254,421 | 250,884.20 |
| | 2000 | 439,132 | 87,826.40 |
| | 2001 | 256,486 | 51,297.20 |
| J. Zane & Shannon R. Creese Smith | 1998 | 375,999 | 75,199.80 |
| | 1999 | 765,397 | 153,079.40 |
| | 2000 | 386,956 | 77,391.20 |
| | 2001 | 290,027 | 58,005.40 |

Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions[2] of the parties, the issues remaining for our consideration are:

1.  Whether petitioners, Rhett Rance and Alice Avila Smith; Joel Rance and LaRhea Smith; and J. Zane and Shannon R. Creese Smith, are entitled to charitable contribution deductions with respect to interests in family limited partnerships contributed to a charitable organization and, if so, what the values of the charitable contributions are;

2.  whether petitioner J. Zane Smith's dog breeding activity constitutes an activity engaged in for profit within the meaning of section 183(a);

3.  whether petitioner J. Zane Smith's cow and dairy farm activity constitutes an activity engaged in for profit within the meaning of section 183(a);

---

[2] A large portion of the trial was devoted to the question of whether an offshore employee leasing arrangement lacked economic substance and/or was a sham.  After presentation of their case in chief, petitioners conceded that the arrangement lacked substance and was a sham.  Petitioners accordingly conceded unreported income and overstated interest deductions related to the offshore arrangement.  They also conceded the applicability of sec. 6662(a) penalties attributable to the unreported income and overstated interest deductions. Petitioners conceded that the 6-year period for assessment under sec. 6501(e)(1)(A) applied with regard to their 1998, 1999, and 2000 tax years.  Respondent conceded that petitioners Rhett Rance Smith (Rhett) and Alice Avila Smith (Alice) substantiated cash charitable contributions of $217,481 for the year 2002 and that they are entitled to reduce their 2002 income by $214,970. Respondent also conceded the issue he raised at trial, that the contributions of business interests were not completed gifts.

4. whether petitioner Rhett Rance Smith's cutting horse activity constituted an activity engaged in for profit within the meaning of section 183(a); and

5. whether petitioners are liable for section 6662(a) accuracy-related penalties for negligence or disregard of rules or regulations with respect to the above-referenced charitable contribution deductions and/or their section 183 activities.

FINDINGS OF FACT

Background

Petitioners Rhett Rance Smith (Rhett) and Alice Avila Smith (Alice) are married and resided in Scottsdale, Arizona, at the time their petitions were filed. They timely filed Forms 1040, U.S. Individual Income Tax Return, for 1998, 1999, 2000, 2001, and 2002. On April 15, 2005, respondent sent notices of deficiency to Rhett and Alice for their 1998, 1999, 2000, and 2001 tax years. On March 25, 2005, respondent sent a notice of deficiency to Rhett and Alice for their 2002 tax year.

Petitioners Joel Rance Smith (Rance) and LaRhea Smith (LaRhea) are married and resided in Eagle Point, Oregon, at the time their petitions were filed. They timely filed Forms 1040 for 1998, 1999, 2000, and 2001. On April 15, 2005, respondent sent notices of deficiency to Rance and LaRhea for their 1998, 1999, 2000, and 2001 tax years.

Petitioners J. Zane Smith (Zane) and Shannon R. Creese Smith (Shannon) are married and resided in Earlville, New York, at the time their petition was filed. They timely filed Forms 1040 for 1998, 1999, 2000, and 2001. On April 15, 2005, respondent sent notices of deficiency to Zane and Shannon for their 1998, 1999, 2000, and 2001 tax years.

Rance and LaRhea Smith are the parents of Rhett and Zane Smith.

Noncash Charitable Contributions

Each couple claimed deductions for noncash charitable contributions of interests in their family limited partnership (FLPs) which, essentially, was to hold interests in their closely held, family-owned Arizona C corporation Beneco, Inc. (Beneco). Beneco had been incorporated in 1989 with 1,000 initially issued shares of stock, held as follows:

| Petitioners | Shares |
|---|---|
| Rance | 250.5 |
| LaRhea | 250.5 |
| Rhett and Alice | 249.5 |
| Zane and Shannon | 249.5 |
| Total | 1,000.0 |

Beneco's business was to provide a qualified retirement plan and trust and qualified health and welfare trust services to contractors who work under prevailing State and Federal wage laws, including the Federal Davis-Bacon Act. For its taxable years ended March 31, 1997 through 2004, Beneco did not pay a dividend.

During December 1995, petitioners' attorney, Robert A. Kelley, Jr. (Attorney Kelley), who specialized in tax and estate planning, established three separate Arizona FLPs in each of which one couple owned a limited partnership interest of approximately 98 percent and the couple's wholly owned corporation, as general partner, owned the remaining 2 percent as follows:

| FLP | Limited Partner | General Partner |
|-----|-----------------|-----------------|
| Jireh LP | J. Rance & LaRhea Smith | J.A. Rohi Corp. |
| Mustard Seed LP | J. Zane & Shannon R. Smith | Z&S Consulting, Inc. |
| Zerubbabel LP | Rhett R. & Alice A. Smith | Bull Run Enters., Inc. |

Each partnership agreement provided that partners could not transfer a partnership interest without prior written consent of all the other partners and that control over the partnership was vested in the general partner (the couple's wholly owned corporation).

During 1995, Rance and LaRhea transferred their 51-percent ownership interest in Beneco to Jireh Limited Partnership (Jireh). Jireh is treated as a partnership for Federal tax purposes, and its only asset is 501 shares of Beneco stock. Sometime after December 20, 1995, Zane and Shannon transferred into Mustard Seed Limited Partnership (Mustard Seed) their 249.5 shares of Beneco

stock which, during the years at issue, were its sole asset. Sometime after December 20, 1995, Rhett and Alice transferred into Zerubbabel Limited Partnership (Zerubbabel) their 249.5 shares of Beneco stock which, during the years at issue, were its sole asset.

Christian Community Foundation (CCF), a section 501(c)(3) charity for tax purposes, was incorporated in 1980 under the laws of Colorado. On or about December 19, 1995, Attorney Kelley sent a letter to CCF, enclosing a check for $1,000 and an Application to Begin a Charitable Project. CCF set up the Zacchaeus Foundation (Zacchaeus), a donor-advised fund, for petitioners and assigned to it account No. 06022.

Attorney Kelley advised CCF that for 1995, Rance and LaRhea would be contributing an FLP interest having a value of $350,000 and that Rhett and Alice and Zane and Shannon would each be contributing an FLP interest having a value of $185,000. Attorney Kelley further advised that petitioners would be making annual gifts in amounts to be determined by their income for the particular year. He further advised that all of the gifts of FLP interests that were made to the project would be reacquired via irrevocable life insurance trusts that were to be funded by life insurance and that application had been made for the insurance.

In 1996, the irrevocable trust of each couple and CCF executed a separate Agreement for the Purchase and Sale of Limited

Partnership Interest.  Each agreement provided that upon the death of the later to die of the couple, CCF had the right to require the trustee to buy CCF's entire limited partnership interest. Similarly, the trust could require CCF to sell its interest to the trustee.  CCF or the trust could exercise the right to buy or sell within "sixty * * * days from the date the * * * [trust] collects the death benefits" from a specified life insurance policy.  It was intended that the sale or purchase transaction be funded by a life insurance policy.

Sometime later, Attorney Kelley left the United States, and petitioners hired Attorney Frederick Meyer (Attorney Meyer). Attorney Meyer conducted a review of petitioners' documents, including wills, family limited partnerships, and insurance trusts, and he discovered what he considered to be inadequacies. Attorney Meyer believed that the partnership agreements should reflect a fiduciary duty to the charity and an obligation to share cashflow with the charity.  Edward Kramer (Mr. Kramer), petitioners' certified public accountant (C.P.A.), and Rance did not believe this was necessary but reluctantly agreed to make the changes.  In 1997 the limited partnership agreements were revised to accommodate the recommended changes.  Petitioners did not rely on Attorney Meyer with respect to valuation questions.  They relied on Mr. Kramer to take care of valuing the partnership

interests.  Petitioners paid annual administrative fees to CCF.
From 1995 through 2001, Rance and LaRhea assigned interests in
Jireh to CCF and claimed the following noncash charitable
contributions deductions:

| Date | Percent Assigned Per Tax Return | Claimed Contribution |
|---|---|---|
| 12/20/95 | 10.9157% | $350,000 |
| 12/29/97 | 9.9133 | Unknown |
| 12/29/00 | 1.5988 | 145,000 |
| 12/31/01 | 11.272 | 480,000 |

Although Form 8283, Noncash Charitable Contributions, for 2000
indicated that an interest of 1.5988 percent had been contributed
to CCF, the actual percentage contributed was 3.22 percent.

Pursuant to Rance and LaRhea's request, during the period
1995 to 2002, CCF directed their contributed interests in Jireh to
Zacchaeus.  During the years 1998 through 2001, Rance and LaRhea
did not transfer any Beneco stock to CCF.  Rance and LaRhea
attached section B of Form 8283 to their 2000 return and described
the donated property as "1.5988% Units Jireh Ltd" with an
appraised fair market value of $145,000.  The Declaration of
Appraiser, part III on Form 8283 for 2000, was signed by Mr.
Kramer and stated that the appraisal date was September 1, 1999.
No such appraisal was attached to Rance and LaRhea's 2000 return
or made a part of the record.

The Donee Acknowledgment, part IV on Form 8283 for 2000, was
signed by Valerie Cornelius, Director of Operations for CCF, next

to the typed date December 29, 2000. Attached to Rance and LaRhea's 2000 return was a letter, dated January 31, 2001, thanking them for their charitable donation on December 29, 2000, and stating that "No goods or services were provided for this donation."

Likewise, Rance and LaRhea attached section B of Form 8283 to their 2001 return and reported the donated property as "11.272% Units (BENECO Stock) JIREH Ltd" with an appraised fair market value of $480,000. Mr. Kramer made the handwritten notation on part III, Declaration of Appraiser, of Rance and LaRhea's 2001 Form 8283 "see attached 11/19/01 report 11/19/2001 Frank E. Koehl Jr." The Form 8283 was not signed by Frank E. Koehl, Jr. (Mr. Koehl). Also attached to Rance and LaRhea's 2001 return was a one-page letter, dated November 19, 2001, from Mr. Koehl, to Rance referring to an $8,500-per-share valuation of Beneco as of March 31, 2000. No such appraisal was attached to Rance and LaRhea's 2001 return. The Donee Acknowledgment, part IV on Form 8283 for 2001, was signed by Valerie Cornelius, and the title "President" and the date "12/26/2001" were typed next to her name. The typewritten title "President" and the date "12/26/2001" were both crossed out, and the title "Treasurer" and the date "4/13/2002" were handwritten. No letter of acknowledgment, gratitude, or statement that no goods or services were received was attached to the 2001 return.

Also attached to Rance and LaRhea's 2001 return were two documents, each captioned "Assignment of Limited Interest In Jireh Limited Partnership with Consent Attached", one signed by Rance and the other by LaRhea.  Each assignment described the assignment to CCF of an FLP interest valued at $240,000 and included CCF's acknowledgment by its president, John C. Mulder, who signed in that capacity.

From 1995 through 2001, Zane and Shannon assigned interests in Mustard Seed to CCF and claimed corresponding noncash charitable contribution deductions on their personal income tax returns, as follows:

| Date | Percent Assigned Per Tax Return | Claimed Contribution |
|------|------|------|
| 12/20/95 | 11.5857% | $185,000 |
| 12/29/97 | 1.95 | Unknown |
| 12/31/98 | 4.11036 | 90,000 |
| 12/31/01 | 8.864 | 188,000 |

Zane and Shannon requested that CCF direct any contributed interests in Mustard Seed to Zacchaeus for the period 1995 to 2002.  During the years 1998 through 2001, Zane and Shannon did not transfer any Beneco stock to CCF.  Form 8283 attached to Zane and Shannon's 1998 return did not include section B, the portion of the form designated for gifts over $5,000.  No appraisal or reference to a specific appraisal was mentioned in or attached to Zane and Shannon's 1998 tax return.  An "Assignment and Agreement" was attached to their 1998 return signed by Zane and Shannon and a

representative of CCF assigning and acknowledging a transfer of an FLP interest with a stated value of $90,000 as of December 31, 1998.  The 1998 return did not have any reference to whether Zane and Shannon received goods or services in connection with their contribution.

During 1998, Zane and Shannon assigned "an economic interest in that percentage of their limited partnership interest in the * * *[Mustard Seed] which has a value of $90,000 as of December 31, 1998, including all interest in the capital * * * of the partnership, but specifically excluding any right * * * to exercise any vote".  Form 8283 attached to Zane and Shannon's 2001 return contains the statement that the donated property was "8.864% units of (Beneco stock) the Mustard Seed LP" with an appraised fair market value of $188,000.

Section B, part III, Declaration of Appraiser, on Zane and Shannon's Form 8283, attached to their 2001 return contained the handwritten notation "see Ltr Attached Frank E. Koehl Jr" on the line to be used for the signature of the appraiser.  The Declaration of Appraiser and Donee Acknowledgment appeared to be signed by Mr. Koehl, and Valerie Cornelius for CCF.  The typewritten date of appraisal in part III was "11/19/2001".  Mr. Kramer made the handwritten notation "see Ltr Attached Frank E. Koehl Jr".  Also attached to Zane and Shannon's 2001 return was a

one-page November 19, 2001, letter from Mr. Koehl to Rance referring to an $8,500-per-share valuation for Beneco as of March 31, 2000.  Also attached to Zane and Shannon's 2001 return was an acknowledgment from CCF of its receipt of the limited partnership interest, advising that "No goods or services were provided for this donation."  Finally, there was attached an assignment of an FLP interest in Mustard Seed, along with a signed consent from CCF by its president.

From 1995 through 2001, Rhett and Alice assigned interests in Zerubbabel to CCF and claimed corresponding noncash charitable contribution deductions on their personal income tax returns, as follows:

| Date | Percent Assigned Per Tax Return | Claimed Contribution |
|------|--------------------------------|---------------------|
| 12/20/95 | 11.587% | $185,000 |
| 12/29/97 | 3.92 | Unknown |
| 12/29/00 | 2.2851 | 100,000 |
| 12/31/01 | 13.674 | 290,000 |

Although Rhett and Alice's Form 8283 for 2000 contained the statement that an interest of 2.2851 percent had been contributed to CCF, the actual percentage contributed was 4.57 percent. Pursuant to Rhett and Alice's request, CCF directed their 1995-2001 assigned interests in their FLP (Zerubbabel) to Zacchaeus. Rhett and Alice did not donate Beneco stock to CCF during the years 1998 through 2001.

Rhett and Alice attached Form 8283 to their 2000 return and in section B, part I, Information on Donated Property, described the donated property as "2.2851% Units Interest Zerubbabel Ltd", stating that it had an appraised fair market value of $100,000. The Declaration of Appraiser was signed by Mr. Kramer and contains the statement that the appraisal date was September 1, 1999. No appraisal was attached to Rhett and Alice's 2000 return, and no appraisal dated September 1, 1999, was provided to respondent or the Court. No signature appeared in the Donee Acknowledgment portion, part IV, of the first section B attached to the return. A second section B was also attached to the 2000 return bearing the Donee Acknowledgment signature of Valerie Cornelius on behalf of CCF. Also attached to the 2000 return was an acknowledgment of the contribution from CCF, dated January 31, 2001, which included the statement "No goods and services were provided for this donation."

Rhett and Alice attached two Forms 8283, section B to their 2001 return and, in each, described the donated property as "13.674% Units (Beneco Stock) Zerrubbable Ltd" with a stated value of $290,000. The signature line of the Declaration of Appraiser was blank on one of the forms. The other had the handwritten notation "see attached 11/19/01 report Frank E. Koehl Jr" with a typewritten address in Princeton, New Jersey, and a typewritten appraisal date of November 19, 2001. Mr. Kramer made the handwritten notation "see attached 11/19/01 report Frank E.

Koehl Jr". No appraisal report was attached to the 2001 return. Attached to the 2001 return was a letter dated November 19, 2001, from Mr. Koehl, stating that the value of Beneco stock, as of March 31, 2000, was $8,500 per share. No detail or explanation as to how the valuation was done was attached to the 2001 return. Also attached to the 2001 return was an assignment of a portion of their FLP by Rhett and by Alice, along with consents and acknowledgment by the president of CCF, signed and dated in late December 2001.

Rhett and Alice assigned an interest in Zerubbabel to Crossmen Ministries in 2002 and claimed a $247,500 charitable deduction for that contribution. Crossmen Ministries was a Texas nonprofit corporation that petitioners organized during 2002. LaRhea, Rance, and Rhett were the officers of Crossmen Ministries. During 2002, Crossmen Ministries was affiliated with World Bible Way Fellowship, Inc. (World Bible Way). During 2002, World Bible Way was a section 501(c)(3) tax-exempt entity which held a group exemption letter, permitting subordinate entities not listed as tax exempt to qualify for tax-exempt status because of their affiliation with World Bible Way.

Rhett and Alice did not donate Beneco stock to World Bible Way or Crossmen Ministries during the years at issue. Rhett and Alice attached section B of Form 8283 to their 2002 return. It described the donated property as "11.67% Of FLP Beneco Stk" with an appraised fair market value of $247,500. That Form 8283

contained no Declaration of Appraiser, and no appraisal is attached. The name and address of the charitable donee was typewritten in section B, part IV, Donee Acknowledgment, but no signature appeared thereon.

Also attached to Rhett and Alice's 2002 return was a document titled "Assignment of Limited Interest in Zerubbabel Limited Partnership with Consent Attached" wherein Alice, as a limited partner of Zerubbabel, assigned an interest in the FLP to Crossmen Ministries. That typewritten document reflected, in two separate locations, the value of the interest to be $91,050 as of December 27, 2002. However, both the $91,050 values were crossed out by hand and "$123,750" was handwritten in its place, along with three sets of initials. The document reflected that Alice signed the document on December 27, 2002, and Crossmen Ministries accepted the assignment to be effective as of December 27, 2002.

Mr. Kramer served as petitioners' C.P.A. for the period 1995 through 2002. He prepared individual income tax returns, corporate returns, partnership returns, payroll tax returns, annual reports, personal property tax returns, and other documents for petitioners and their related entities. Mr. Kramer, at the times he was responsible for the preparation of petitioners' tax returns, was aware of section 170 and the reporting requirements for noncash charitable contributions during the years at issue. He was also aware that the noncash

charitable contribution regulations required that taxpayers use an appraiser who represented that he was in the business of conducting appraisals for the general public. Mr. Kramer was not a certified appraiser.

In addition to preparing petitioners' returns, Mr. Kramer, for purposes of a 1995 tax year noncash charitable contribution, performed a September 30, 1995, valuation of Beneco. Mr. Kramer's valuation did not state that it was prepared for income tax purposes or provide the date of any contributions to the charitable donee. Mr. Kramer's 1995 estimated fair market value of a 100-percent interest of Beneco stock was $6,400,000, as of September 30, 1995. In valuing petitioners' FLPs, Mr. Kramer simply chose to value the Beneco stock because it was the FLPs' only asset and the valuations of the FLPs depended in great part on the valuation of the Beneco stock. The 1995 valuation of the Beneco stock was used for the charitable contribution deductions of FLP interests claimed for the 1998 through 2000 tax years.

The methodology Mr. Kramer used to value the FLP interests petitioners contributed was to obtain an appraised value of the Beneco stock and then to discount that value for minority interest and lack of marketability factors. No separate discount was used with respect to the FLP interests contributed to the charitable organization. Mr. Kramer valued the Beneco stock and did not separately assess the value of the partnership units.

After his 1995 valuation, sometime around 1999-2000, Mr. Kramer advised petitioners to hire a certified appraiser.

On April 5, 2000, Rance, as president of Beneco, retained Management Planning, Inc. (MPI), to prepare economic and financial analyses and evaluations of Beneco, and three limited partnerships (Jireh, Mustard Seed, and Zerubbabel) for a fee of $12,500. Mr. Koehl of MPI transmitted by a letter dated November 19, 2001, an evaluation of the "common stock of Beneco, Inc.," as of March 31, 2000, concluding that the aggregate freely traded equity capital of Beneco had a value of $9,195,000.

Mr. Koehl opined that the average lack of marketability discount for private placements of nonpublicly traded stocks was 27.5 percent, and he decided to use a lack of marketability discount of 7.5 percent because he was valuing a controlling interest. Mr. Koehl concluded that the outstanding common stock of Beneco had a fair market value of $8.5 million (or $8,500 per share, based on 1,000 shares issued and outstanding) as of March 31, 2000, on a going-concern controlling-interest basis. Mr. Koehl and MPI did not prepare a separate valuation of petitioners' limited partnerships, Jireh, Mustard Seed, or Zerubbabel. Mr. Koehl's valuation of Beneco contained the statement that it was prepared for management information, income tax reporting, and other corporate purposes. Mr. Koehl's valuation did not contain a date for any contributions of an FLP

interest to any particular donee, and it did not contain a separate valuation of each FLP. The valuations by Mr. Kramer and Mr. Koehl were the only valuations referenced in petitioners' returns.

Rance's Schedule F Activity

Rance began his cutting horse activity with a few horses in 1999. During the years at issue, Rance maintained several horses in his cutting horse activity. For the taxable years 1998 through 2005 Rance reported the following total income, expenses, and net losses:

| Year | Income | Expenses | Net Losses |
|---|---|---|---|
| 1998 | -0- | $124,291 | $124,291 |
| 1999 | -0- | 76,352 | 76,352 |
| 2000 | -0- | 65,486 | 65,486 |
| 2001 | $1,736 | 83,630 | 81,894 |
| 2002 | 3,817 | 83,691 | 79,874 |
| 2003 | 4,583 | 48,903 | 44,320 |
| 2004 | 4,084 | 66,677 | 62,593 |
| 2005 | 1,959 | 44,474 | 42,515 |
| Total | 16,179 | 593,504 | 577,325 |

The expenses were generally attributable to depreciation, animal and land maintenance, mortgage interest, and training. Other than the Schedules F, Profit or Loss From Farming, which were part of the tax returns and banking records, Rance did not maintain books and records of his horse cutting activity.

Rance rides his own horses at horse futurities (shows), and he first rode horses when he was a child and continued to ride when he attended college. He became involved in the cutting

horse activity in the 1980s and discontinued the activity during 1987 because it was expensive, competitive, and risky, and he had a champion mare that had achieved success by winning the Pacific Coast Derby. During 1996, Rance and LaRhea purchased approximately 70 to 75 acres of land in Oregon. In October 1998, they began construction of a house, an office, a barn, fences, and stalls. The property was to be for their personal residence and activities as well as for conducting part of their Beneco business. Construction was completed in November 1999, after which Rance and LaRhea moved to the Oregon property.

The barn had four horse stalls, a tack room, a feed room, and storage for hay and related farm equipment. During 1999, Rance purchased P.K., a driving horse which pulled carts and wagons and which Rance rode. Also during 1999, Rance purchased Leo, a western pleasure mule, which he rode around the Oregon property to check fences and tend the property. P.K. was sold sometime during 2000 or 2001. Rance also purchased Popcorn, a Royal Dartmoor pony mare that was in foal. Popcorn was a hunter/jumper, and she was sold, along with her foal, sometime in 2001 or 2002.

Rance again became involved in cutting horse activity because he could afford horses with better pedigrees. He purchased a 4-year-old, Dual Docs (Dual Docs), in 2001 for $30,000 and placed him in training in Medford with Bobby and

Jolene Nelson. Semen was collected from Dual Docs, and he was used for live breeding, resulting in revenue of several thousand dollars. Dual Docs was entered in competitions and then sold in 2004 for $22,500.

Rance, sometime in 2001 or 2002, acquired cutting horse reining mares named Mitzi and I Gotta Lotta. He then determined that they could not be entered into competitions, and he allowed high school girls to ride them in 4-H Club activities and other events. I Gotta Lotta was sold in 2003 for $6,000 and Mitzi was sold in 2004 for $6,300 for reported gains of $839 and $230, respectively.

Zane's Dog Breeding, Showing and Judging Activity

Zane first became interested in showing dogs after his parents bought him his first Staffordshire Bull Terrier and took him to a dog show at age 12. During grade school and high school, Zane owned and learned to show Staffordshire Bull Terriers. By 1995 or 1996, when Zane had substantial experience and had developed a reputation, he began contemplating conducting the dog breeding activity on a much more serious level. During the years at issue, he was considered a worldwide expert in and primarily focused on Staffordshire Bull Terriers and American Staffordshire Terriers.

Zane became a championship show judge in 1985 at age 22, the youngest in recent history, and has judged in shows all over the

world. Zane has not won more than nominal amounts showing dogs, and he did not earn any income from judging during the years at issue.

Zane did not have a written business plan for his dog breeding activity. He did not keep a separate checking account for his dog breeding activity. When he wrote a check, he noted the purpose of the expense. At the end of the year, Zane summarized the expenses for his C.P.A. for purposes of preparing his returns. Zane spent approximately 10 to 20 hours each week on the dog breeding activity and was showing one or two dogs regularly and three or four dogs less often.

Zane had two Staffordshire Bull Terriers living with him in New York from 1996 through 2003, and his other dogs lived with professional handlers. In addition, Zane coowned some dogs that lived with his coowners. Zane had no income from the dog breeding activity in any of the years 1996, 1997, 1998, 1999, and 2000. Zane's 1997 Schedule C, Profit or Loss From Business, reflected no income and $52,683 in expenses. Zane's Schedules F attached to his other returns were entitled "Cattle Crops--Dog Breeding" and for 2004 included the term "Organic Dairy Milk". Some of them reflected income, but the source was not specified.

The following table shows the losses Zane claimed for the dog breeding activity for the years 1997 through 2004:

| Tax Year | Total Income | Total Expenses | Total Losses |
|---------|-------------|----------------|--------------|
| 1997 | -- | $52,683 | ($52,683) |
| 1998 | -- | 61,490 | (61,490) |
| 1999 | -- | 28,826 | (28,826) |
| 2000 | -- | 51,409 | (51,409) |
| 2001 | -- | 80,152 | (80,152) |
| 2002 | -- | 56,818 | (56,818) |
| 2003 | $5,673 | 7,651 | (1,978) |
| 2004 | -- | 6,064 | (6,064) |
| Total | 5,673 | 345,093 | (339,420) |

Most of the expenditures were for travel, advertising, and show expenses.  For example, in 1997, of the $52,683 of total expenses claimed, $28,676 was for show expenses, $10,850 for travel, and $9,800 for advertising.  Accordingly, $49,326 of the $52,683 (almost 94 percent) was for shows, travel, and advertising.  Most of the expenses were associated with showing dogs and judging dog shows.

According to a March 2004 report from Synbiotics, Zane had 44 semen straws stored from the dog Malcolm.  Synbiotics calculated that 7.9 inseminations could be accomplished from the 44 straws.

Zane's Cow and Dairy Farm Activity

Zane had an interest in cattle as a boy, and in July 1998, he purchased a 400-acre property in Earlville, New York, known as Goose Hill Farm.  Zane had an interest in genetics and animal husbandry beginning with the Staffordshire Bull Terriers when he was a boy.  Zane developed an interest in Normande cows, and he

believed that they are good milking cows and grazing animals.  He built his personal residence at Goose Hill Farm with the intent to raise cows.

In 2000, Zane also purchased the Columbus Dairy, consisting of 225 acres and located 15 miles from Goose Hill Farm.  A milking parlor and dairy operation were built at the Columbus Dairy, and calves were raised on the Goose Hill Farm property.  After purchasing the Columbus Dairy, Zane worked to reclaim the pasture land for grazing.

He studied and researched the various types of cattle that could be bred.  Zane recognized that family dairy farms were not doing well, and he decided that, to be profitable, his cattle activity had to find a niche in the market that would let it compete as to product and price.  After much research he decided to raise Normande cattle.  The Columbus Dairy became an organic dairy farm.  At the Columbus Dairy, Zane built a milking parlor and other buildings for the milking operation.  Milking started sometime in 2002.

Normande cows are good producers of milk in France but are largely used for beef consumption in the United States.  After visiting many farmers and ranchers throughout the United States, Zane acquired a herd of Normande cows that he believed would be the best milk producers.  He intended to further breed the acquired herd so his activity could become competitive in the dairy farming industry.

Zane had a 7-year business plan involving the importation of bull semen from France, as he could not import Normande cows to breed with his cows to produce offspring that he believed could produce a higher quantity and better quality of milk.  At the same time, Zane was working to convert his land from a conventional to a certified organic farm.  Zane believed that if his farm could be certified as organic, he would be able to sell the milk at a price three times that of conventional milk.

By the time of trial, Zane's animal breeding was progressing, and he hoped he could focus more on the cow activity and less on the dog breeding.  The farm was certified organic in 2006.  His gross revenues exceeded $100,000 for 2004, 2005, and 2006.  Zane expects the revenue to triple in 2007 because of the organic certification.  In operating this activity, Zane has consulted with experts, done marketing, maintained separate checking account records, and has focused on ways to maximize revenue.

During August 2001, Zane purchased 77 Normande cows from Keith Miller of Stuart, Iowa.  Beginning in May 2001, David Hughes (Mr. Hughes) had become Zane's part-time farm manager in exchange for a place to live at the Columbus Dairy.  Beginning in January 2002, Mr. Hughes became Zane's full-time employee.  Zane paid Mr. Hughes approximately $29,000 to $30,000 in cash wages

and also provided him a double-wide trailer to live in and allowed him personal use of a pickup truck. Mr. Hughes performed the farm labor and Zane was the decision maker for the activity.

Zane decided to graze his cattle rather than confine them because he believed that grazing positively affected the longevity of the cattle. He also leased an additional 60 acres of a farm adjacent to Columbus Dairy for the purpose of grazing cows. All milk cows were grazed at the Columbus Dairy property and on the adjacent leased land. Automatic milking equipment was placed in service in October 2001, and milking operations commenced during 2002. Zane began reporting the cattle activity and deducting expenses in his 1998 tax year. Zane kept a separate bank account for the Columbus Dairy.

Penalties--Reliance

Through the 2001 tax year, Mr. Kramer prepared Rance and LaRhea's tax returns. Mr. Kramer understood that one of the purposes of the Oregon property was to raise and breed horses. He believed that Rance and LaRhea purchased the Oregon property on account of their concerns about "Y2K" and their desire to have a self-sustaining facility. Mr. Kramer told Rance and LaRhea from the beginning of their Schedule F activity that they needed to show revenues in order to avoid "hobby loss classification". The only revenue Mr. Kramer was aware of was the sale of one horse in the second or third year.

Mr. Kramer advised Rance to combine his Oregon Schedule F activity with Zane's New York Schedule F activity to keep them from being classified as hobbies. Rance and Zane did not follow Mr. Kramer's advice on forming a joint venture. Mr. Kramer did not know how Zane used his property. Mr. Kramer did not ask for or see any of Zane's underlying financial records in connection with his Schedule F activity.

Mr. Kramer included on the returns all the expenses petitioners listed for him. Mr. Kramer knew the dog breeding business was expensive and that it was speculative, with a very small percentage of success. Mr. Kramer knew that it was very difficult to earn money in the dog breeding business. Mr. Kramer did not question the travel expense claimed on Zane's 1998 Schedule F because he knew that Zane traveled overseas as well as around the country. Mr. Kramer knew that expenses incurred at the Westminster dog show were extensive. Mr. Kramer understood that Zane had a cattle breeding activity separate from the dairy operation.

## OPINION

### Burden of Proof

Petitioners, for the first time on brief, raise the issue of whether the burden of proof shifted to respondent under section 7491(a). Under that section the burden of proof may shift to the

Commissioner with respect to a factual issue affecting the taxpayer's liability for tax where the taxpayer introduces credible evidence with respect to such a factual issue and meets certain substantiation requirements set forth in section 7491(a)(2)(A) and (B).

Respondent contends that petitioners' argument as to the burden of proof was untimely raised and that, even if it had been timely, it is petitioners' burden to show that they have met the requirements of section 7491(a)(2), which they have not done. We agree with respondent that petitioners' attempt to raise section 7491 for the first time in their posttrial brief is untimely.

Under section 7491 petitioners must, for example, show that they cooperated during the audit and that they met substantiation requirements. Petitioners' attempt on brief to show that they met the requirements by the simple expediency of stating that respondent did not question the substantiation or that they cooperated will not suffice. Petitioners, by raising those allegations on brief, do not afford respondent the opportunity to test the allegations by cross-examination or by producing evidence to show otherwise. Therefore, we hold that petitioners' attempt to shift the burden under section 7491 causes prejudice

and is untimely.[3]  See, e.g., <u>Deihl v. Commissioner</u>, T.C. Memo.
2005-287.

Accordingly, petitioners continue to bear the burden of
proof with respect to the noncash charitable contribution issue
and the question of whether they carried on various activities
for profit within the meaning of section 183.  Respondent does
bear the burden of production with respect to the section 6662
penalty.  See sec. 7491(c).  That burden is to come forward with
sufficient evidence regarding the appropriateness of applying a
particular addition to tax or penalty against the taxpayer.  Sec.
7491(c);  <u>Wheeler v. Commissioner</u>, 127 T.C. 200 (2006); <u>Higbee v.
Commissioner</u>, 116 T.C. 438 (2001).

<u>Noncash Charitable Contributions</u>

Petitioners are members of the same family comprising a
father (Rance) and two sons (Rhett and Zane) and their respective
spouses.  Together, they owned and operated Beneco, a corporation
that provides business services in connection with qualified
retirement and health and welfare plans.  Rance and his wife
owned slightly over 50 percent of Beneco, and Rhett and Zane,
along with their wives, each owned one-half of the remaining
minority interest.  Petitioners claimed noncash charitable
contributions of FLP interests.  The FLPs were created and

---

[3] In any event, petitioners have not shown compliance with
the substantiation requirements of sec. 7491(a)(2) so as to
warrant a shift in the burden of proof as to any of the factual
issues relevant to their liability for tax.

designed to hold interests in Beneco, which were to be contributed to the FLPs by petitioners. The issues concerning these contributions are whether petitioners complied with the reporting requisites of section 170 and underlying regulations so as to be entitled to the charitable contribution deductions. If we find that petitioners complied with those requisites, we will go on to consider the values of the interests contributed in order to decide the amounts of any allowable charitable contribution deductions.

Section 170(a)(1) provides:

> There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

If the contribution consists of property other than cash, the value of the contribution is generally the fair market value of the donated property at the time of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

Respondent argues that petitioners are not entitled to the noncash charitable contribution deductions claimed because they failed to comply with the reporting requirements of section 170 and the underlying regulations. Petitioners acknowledge that they failed to fully comply with some of the requirements for noncash charitable contribution deductions. Petitioners argue, however, that they are nevertheless entitled to the deductions

for the noncash charitable contributions because they substantially complied (that the information provided is sufficient to meet the requirements) and because they had "reasonable cause * * * for [any] failure to fully comply."

A charitable contribution is allowable as a deduction only if verified under regulations prescribed by the Secretary. Sec. 170(a)(1); Hewitt v. Commissioner, 109 T.C. 258, 261 (1997), affd. without published opinion 166 F.3d 332 (4th Cir. 1998). The obligation to substantiate charitable contribution deductions is clear and unambiguous. Blair v. Commissioner, T.C. Memo. 1988-581. No deduction is allowed for a contribution in excess of $5,000 unless the taxpayer meets the substantiation requirements of section 1.170A-13(c)(2), Income Tax Regs. Todd v. Commissioner, 118 T.C. 334, 340 (2002); sec. 1.170A-13(c)(1)(i) Income Tax Regs. Section 1.170A-13(c)(2)(i), Income Tax Regs., generally provides that a taxpayer must comply with the following three requirements:

> (A) Obtain a qualified appraisal (as defined in paragraph (c)(3) of this section) for such property contributed. If the contributed property is a partial interest, the appraisal shall be of the partial interest.

> (B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return (or, in the case of a donor that is a partnership or S corporation, the information return) on which the deduction for the contribution is first claimed (or reported) by the donor.

> (C) Maintain records containing the information required by paragraph (b)(2)(ii) of this section.

Additionally, for contributions of $250 or more, a taxpayer must obtain a contemporaneous written acknowledgment from the donee organization. Sec. 170(f)(8)(A). The acknowledgment must be obtained by the earlier of the date the return is filed or its due date. Sec. 170(f)(8)(C). The acknowledgment must include the amount of cash and a description of any property other than cash along with certain information about any goods or services provided by the donee. Sec. 170(f)(8)(B).

The purpose of these provisions has been described as providing the Commissioner with sufficient return information to effectively monitor the possibility of overvaluations of charitable contributions. Hewitt v. Commissioner, supra at 265.

Section 1.170A-13(c)(3)(i) and (ii), Income Tax Regs., contains the specific requirements that a "qualified appraisal" must:

(1) Be made not earlier than 60 days before the date of the contribution nor later than the due date of the return, including extensions, on which a deduction is first claimed or reported;

(2) be prepared, signed and dated by a qualified appraiser;

(3) contain the name address, identifying number, and qualifications of the qualified appraiser;

(4) contain a statement that it was prepared for income tax purposes;

(5) contain a description of the property in sufficient detail for a person who is not generally familiar with the type

of property to ascertain that the property that was appraised is the property that was contributed;

(6) include the terms of any agreement of understanding entered into or expected to be entered into by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property, including an agreement that restricts temporarily or permanently a donee's right to dispose of the property;

(7) show the date on which the property was contributed;

(8) show the fair market value of the property on the date of contribution;

(9) show the method of valuation and the specific bases for the valuation; and

(10) show the date on which the appraisal was made.

The Secretary promulgated the above-referenced regulations in response to the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 155(a), 98 Stat. 691. DEFRA section 155 instructs the Secretary to provide heightened substantiation reporting requirements for certain noncash charitable contributions. DEFRA section 155 provides:

> (3) Appraisal summary.--For purposes of this subsection, the appraisal summary shall be in such form and include such information as the Secretary prescribes by regulations. Such summary shall be signed by the qualified appraiser preparing the qualified appraisal and shall contain the TIN of such appraiser. Such summary shall be acknowledged by the donee of the property appraised in such manner as the Secretary prescribes in such regulations.

(4) Qualified appraisal.--The term "qualified appraisal" means an appraisal prepared by a qualified appraiser which includes—

(A) a description of the property appraised,

(B) the fair market value of such property on the date of contribution and the specific basis for the valuation,

(C) a statement that such appraisal was prepared for income tax purposes,

(D) the qualifications of the qualified appraiser,

(E) the signature and TIN of such appraiser, and

(F) such additional information as the Secretary prescribes in such regulations.

See Bond v. Commissioner, 100 T.C. 32, 37 (1993). In Bond this Court considered whether certain aspects of the above-referenced regulations were mandatory or directory and whether the taxpayer in that case had substantially complied so as to be entitled to a charitable contribution deduction. In reaching the conclusion that the requirements were directory, the Court expressed the following rationale:

Under the above test we must examine section 170 to determine whether the requirements of the regulations are mandatory or directory with respect to its statutory purpose. At the outset, it is apparent that the essence of section 170 is to allow certain taxpayers a charitable deduction for contributions made to certain organizations. It is equally apparent that the reporting requirements of section 1.170A-13, Income Tax Regs., are helpful to respondent in the processing and auditing of returns on which charitable deductions

are claimed.  However, the reporting requirements do not relate to the substance or essence of whether or not a charitable contribution was actually made.  We conclude, therefore, that the reporting requirements are directory and not mandatory.  [Id. at 41; citation omitted.]

Bond involved the contribution of two blimps to a qualified charity.  The parties agreed upon the value, the fact that the appraiser was qualified, and all other regulatory requirements except whether the taxpayers' failure to obtain and attach to their return a separate written appraisal containing the information specified in the regulations would result in the disallowance of a charitable contribution deduction.  The Court noted that substantially all of the information specified in the regulations had been provided, except the qualifications of the appraiser on the Form 8283 attached to the return.  The Court concluded that the taxpayers in Bond had substantially complied and that disallowance of the deduction under those circumstances would be too harsh a sanction (essentially that the purposes of the statute had been substantially achieved).

Subsequently, in Hewitt v. Commissioner, 109 T.C. 258 (1997), the Court again considered these regulations in a situation where taxpayers donated to a charitable organization their shares of stock of a corporation that was not publicly traded.  They claimed deductions in amounts that the parties agreed represented the fair market value of the stock.  However,

the taxpayers did not obtain qualified appraisals before filing their returns for the years at issue. The values or deductions claimed were not based upon appraisals; instead they were based upon average per-share prices of the stock traded in arm's-length transactions at approximately the same time as the gifts. Even though the values were undisputed, the Court found that the taxpayers had not complied with section 170 and section 1.170A-13, Income Tax Regs., and that they were not entitled to deduct any amount in excess of the amount allowed by the Government, which was their basis.

In Hewitt the Government disallowed the value of the stock in excess of basis because of the lack of qualified appraisals. The Government agreed that the taxpayers made charitable contributions, that the donee was charitable, and that the claimed values represented fair market values of the contributions. The taxpayers in Hewitt maintained that they should be allowed the deductions because the value used was the average price per share as traded in bona fide, arm's-length transactions. Relying on the holding in Bond v. Commissioner, supra, the taxpayers in Hewitt contended that they had substantially complied with the requirements of section 1.170A-13, Income Tax Regs., and that they were relieved of any obligation to obtain a qualified appraisal. Hewitt v. Commissioner, supra at 262.

Unlike the taxpayers in <u>Bond</u>, the taxpayers in <u>Hewitt</u> did not provide information on the Form 8283 that satisfied most of the requirements of the regulation.  In holding that the taxpayers were not entitled to a deduction in excess of their basis (for the full fair market value), the Court provided the following rationale:

> Petitioners herein furnished practically none of the information required by either the statute or the regulations.  Given the statutory language and the thrust of the concerns about the need of respondent to be provided with appropriate information in order to alert respondent to potential overvaluations, * * * petitioners simply do not fall within the permissible boundaries of <u>Bond v. Commissioner</u>, <u>supra</u>, where an appraisal summary, which was completed by a qualified appraiser, contained most of the required information and could therefore be treated as a written appraisal, was attached to the return. Cf. <u>D'Arcangelo v. Commissioner</u>, T.C. Memo. 1994-572 (respondent prevailed where no qualified appraisal was obtained).

>     *    *    *    *    *    *    *

> Moreover, it is clear that the principal objective of DEFRA section 155 was to provide a mechanism whereby respondent would obtain sufficient return information in support of the claimed valuation of charitable contributions of property to enable respondent to deal more effectively with the prevalent use of overvaluations.  See S. Comm. on Finance, Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. 98-169 (Vol. 1), at 444-445 (S. Comm. Print 1984); Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (J. Comm. Print 1985); cf. <u>Atlantic Veneer Corp. v. Commissioner</u>, 85 T.C. 1075, 1084 (1985), affd. 812 F.2d 158 (4th Cir. 1987). Such need exists even though in a particular case, such as this, it turns out that the taxpayer's deduction was in fact based on the fair market value of the property. This happenstance is insufficient to constitute substantial compliance with

a statutory condition to obtaining the claimed deduction. As we see it, what petitioners are seeking is not the application of the substantial compliance principle but an exemption from the clear requirement of the statute and regulations in a situation where there is no overvaluation of the charitable contribution. We are not prepared to follow that path to decision. [Hewitt v. Commissioner, supra at 264-266].

Petitioners also rely on Bond v. Commissioner, 100 T.C. 32 (1993). In particular, they contend that in Bond this Court:

determined that the substantiation rules of DEFRA section 155 and the Treasury Regulations thereunder are directory rather than mandatory. As such, the Tax Court does not require that taxpayers fully and absolutely comply with the substantiation requirements of the regulations in order to qualify for a charitable contribution deduction. In Bond, the Tax Court used a "substantial compliance" analysis to determine that a taxpayer, who failed to meet the substantiation requirements of DEFRA section 155 and the regulations, nevertheless, was entitled to a charitable deduction for a non-cash contribution.

Petitioners go on to attempt to equate the concept of "substantial compliance" with the concept of "reasonable cause". Petitioners contend that

Although not specifically mentioning reasonable cause, the decision of the Tax Court in Bond is a clear reflection of the principal that [exceptions exist] to the heightened substantiation reporting requirements such as substantial compliance and reasonable cause.

We note that for charitable contributions made after June 3, 2004, Congress, in the American Jobs Creation Act of 2004 (AJCA), Pub. L. 108-357, sec. 883, 118 Stat. 1631, which added section 170(f)(11), specifically codified the substantiation

requirements and also provided an exception where there is reasonable cause for failure to comply with the substantiation requirements for noncash charitable contributions.  Petitioners contend that the reasonable cause exception in AJCA was a codification of preexisting law.  Respondent contends that the reasonable cause exception was not the law before the 2004 enactment.  We agree with respondent.

Petitioners rely, in great part, on the legislative history surrounding the 1984 enactment of DEFRA section 155, which in effect, directed the Secretary to promulgate the qualified appraisal regulations.  It appears that a reasonable cause exception was considered by Congress, but no such exception was included in DEFRA, and none appeared in the regulations issued pursuant to the regulatory mandate of DEFRA section 155.  We find no sound basis for accepting petitioners' contention that a reasonable cause exception existed before the 2004 enactment of that exception.

Because the charitable contribution deductions we consider are for years before and unaffected by AJCA, we are left to decide whether petitioners substantially complied, like the taxpayers in Bond v. Commissioner, supra, or whether the information included on and with their income tax returns was insufficient to meet the statutory and regulatory requirements

like that of the taxpayers in Hewitt v. Commissioner, 109 T.C. 258 (1997).

Petitioners, during 1995, consulted with Attorney Kelley concerning income and estate tax planning. Attorney Kelley directed and assisted petitioners in setting up an FLP for each couple. Each couple also established a corporation to be the general partner of their FLP, and the individuals were made the limited partners of their respective partnerships. The general partner (the controlled corporation of each couple) had operating authority over each FLP. A limited partner's interest could not be transferred without permission of all other partners in the FLP. Each couple contributed their Beneco stock, along with other assets, to their FLP in 1995.

Attorney Kelley assisted petitioners with their donations of interests in their limited partnerships to CCF. CCF anticipated that petitioners would make gifts of interests in the FLPs in 1995 and in future years. It was understood that the transferred FLP interests would be reacquired from CCF (or other charitable donee), and irrevocable life insurance trusts were created that would be used to fund the reacquisition of the contributed interest upon each donor's death.

At the time of the contributions of the FLP interests, CCF, and later Crossmen Ministries, received FLP interests that could not be transferred without petitioners' and their wholly owned

corporate general partners' consent. Therefore, the interests could not be converted to cash or other property that could be used to fund charitable activities without petitioners' agreement. By the end of 1998, the sole asset in each FLP was Beneco stock. Beneco did not pay any dividends before 1995, and no dividends were paid thereafter and through the years in issue. The decision for Beneco to pay dividends appeared to rest solely with petitioners. Therefore, the donee-charity would likely be relegated to waiting until the deaths of petitioners before receiving cash or property that could be used to fund charitable activity.

Zane and Shannon's 1998 contribution and Rhett and Alice's 2000 contribution consisted solely of economic interests in their respective FLPs. It is not clear what status or role CCF played in the respective FLPs. No express distinction was made between limited partners and any charitable donees who held interests in the FLPs.

The contributions were ascribed values in round dollar amounts (e.g., $145,000) that were converted to percentages in each FLP on the basis of the Beneco stock values petitioners used to establish the amounts of the deductions. As described below, the Forms 8283 attached to the returns were prepared in an inattentive and incomplete manner.

Initially, we note that valuations petitioners relied on were based on valuations of the Beneco stock from which the valuations of the contributed interests in the family limited partnerships were derived. Although the values of the FLP interests were substantially dependent upon the values of the Beneco stock, the noncash charitable contribution, in each instance, was an interest in an FLP. Mr. Koehl was asked to appraise both the Beneco stock and the FLP interests. The record, however, does not contain a separate appraisal report for the FLP interests. Mr. Koehl prepared a valuation of the Beneco stock as of March 31, 2000, but it was not attached to any of petitioners' 2001 or 2002 returns in connection with their claimed charitable contributions of FLP interests.

Although petitioners obtained two separate appraisals, respondent contends that neither is a qualified appraisal within the meaning of section 1.170A-13(c)(3), Income Tax Regs. The first appraisal was of the Beneco stock and was performed by petitioners' C.P.A., Mr. Kramer. Although Mr. Kramer is a C.P.A., it has not been shown that he had appraisal expertise. His report, dated November 17, 1995, stated a $6,400,000 value for a 100-percent interest in Beneco stock as of September 30, 1995. Mr. Kramer's valuation report is terse and provides only limited details of the analysis and underpinnings for his value conclusion. On petitioners' Forms 8283 for 2000, the Declaration

of Appraiser was signed by Mr. Kramer, and references were made to a September 1, 1999, appraisal. Petitioners did not produce a September 1, 1999, appraisal report, and no such appraisal report was attached to their returns.

The second appraisal was performed Mr. Koehl of Management Planning, Inc., a company in the valuation business. Mr. Koehl determined that the aggregate enterprise value of Beneco, on a controlling interest basis, was $8.5 million as of March 31, 2000. Mr. Koehl did not prepare a separate analysis or valuation of the partnership interests. His report appears to have been completed after the due date for filing petitioners' 2000 returns. Forms 8283 for 2001 referred to Mr. Koehl's valuation, and Rhett and Alice's 2002 contribution was apparently based upon that same appraisal report by Mr. Koehl. Some of the returns had a one-page letter from Mr. Koehl that fell far short of meeting the statutory and regulatory requirements for an appraisal summary. Other returns had no letter, summary, or appraisal report attached.

At trial, petitioners' expert, Scott Springer, valued the partnership interests as of the dates of the contributions. This report, however, was prepared for purposes of trial and did not purport to be a qualified appraisal within the meaning of the regulations under consideration.

Accordingly, the appraisals petitioners relied on for claiming deductions were not made for the period beginning 60

days before any of the contributions and ending on the due dates of the corresponding returns. See sec. 1.170A-13(c)(3)(i)(A), Income Tax Regs. Additionally, the 1995 report by Mr. Kramer did not specifically state that it was prepared for income tax purposes. See sec. 1.170A-13(c)(3)(ii)(G), Income Tax Regs. The appraisal reports did not contain the dates (or expected dates) of the contributions of the interests in the FLPs to the donee or the values on these dates. See sec. 1.170A-13(c)(3)(ii)(C), (I), Income Tax Regs. Respondent, referencing section 1.170A-13(c)(3)(ii)(D), Income Tax Regs., also notes that the restrictions on the donee's right to use or dispose of the donated property, as set forth in the partnership agreements, and purchase and sale agreements, were not disclosed.

The Forms 8283 and the documents attached to petitioners' returns failed to comply with the section 1.170A-13(c)(4), Income Tax Regs., requirements that an appraisal summary be signed and dated by a qualified appraiser who prepared the qualified appraisal and include the information specified in section 1.170A-13(c)(4)(ii), Income Tax Regs. That regulation section requires that the summary contain, inter alia, a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was

contributed; the manner of acquisition and the date of acquisition; the cost or other basis of the property; and the name, address and identifying number of the qualified appraiser who signs the appraisal summary. Section B of Form 8283 is the form designed for the appraisal summary.

The Forms 8283 attached to the returns were in many respects either improperly or incompletely prepared. Zane and Shannon did not attach a Schedule B to the Form 8283 that was attached to their 1998 income tax return. Instead they completed section A, which is expressly intended to be used for noncash charitable contributions worth $5,000 or less. As a result, their 1998 return contained no declaration by appraiser and no acknowledgment of the donee.

On the Forms 8283 attached to Rance and LaRhea's and Rhett and Alice's 2000 returns, Mr. Kramer signed the Declaration of Appraiser and referred to an appraisal dated September 1, 1999, that was not attached to the returns or shown to have existed. Rance and LaRhea's return reflected that an interest of 1.5988 percent of the partnership with a value of $145,000 was contributed to CCF. The parties have now agreed and stipulated that Lance and LaRhea contributed a 3.22-percent interest with a total value of $145,000. Rhett and Alice's return reflected that an interest of 2.2851 percent of the partnership with a value of $100,000 was contributed to CCF. The parties have now agreed and

stipulated that Rhett and Alice contributed a 4.57-percent interest with a total value of $100,000.

Each couple claimed a charitable contribution deduction for 2001. In each instance, the Declaration of Appraiser attached to the return referred to the letter dated November 19, 2001, from Mr. Koehl to Rance wherein he opined that the value of Beneco as of March 31, 2000, was $8.5 million. Mr. Koehl did not sign the Declaration. Instead, Mr. Kramer wrote Mr. Koehl's name in the signature area designated for the "qualified appraiser". Mr. Koehl's letter stating an $8.5 million value was attached to some of the returns, but it was terse and fell far short of meeting the summary appraisal requirements.

For 2002, Rhett and Alice's return contained the description of the donated property as "11.67% OF FLP BENECO STK". The Declaration of Appraiser in section B of Form 8283 was left blank, and the Donee Acknowledgment portion was unsigned. The Donee Acknowledgment stated that the donee was CCF; however, the assignment document attached to the return indicated that the donee was Crossmen Ministries. Typed on the assignment was "$91,050" as the amount of the contribution. That amount, however, was crossed out and "$123,750" was handwritten below it. Only the assignment for Alice was attached to the return although Rhett had apparently signed a similar document.

Under these circumstances we consider whether petitioners' compliance was substantial or whether they failed to meet the

statutorily mandated regulatory requirements.  Bond v. Commissioner, 100 T.C. 32 (1993), and Hewitt v. Commissioner, 109 T.C. 258 (1997), considered together, provide a standard by which we can consider whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress.  If they provided sufficient information, their "substantial compliance" would adequately serve the purposes intended by Congress.

We hold that petitioners did not provide sufficient information and/or submit the documents required to have substantially complied and they are, therefore, not entitled to deductions for noncash charitable contributions of FLP interests, as determined by respondent.  Petitioners, in each year under consideration, did not attach to their returns qualified summary appraisal reports as required by the statute and the regulations. In addition, it has not been shown that petitioners' C.P.A. was a qualified appraiser within the meaning of the regulatory requirements.  Moreover, certain of the reports that were referenced on the returns were not shown to exist, and none of the purported reports or documentation submitted met the time requirements for their preparation and submission.  The contributed property interests were not fully or adequately described so as to permit respondent to understand the valuation methodology, and the documentation submitted was terse and did not adequately explain the bases for the values claimed.

Our review of the materials and information that petitioners submitted to respondent with their returns reveals that important information that would have enabled respondent to understand and monitor the claimed contributions was not supplied. Congress mandated the reporting information so that the Internal Revenue Service (IRS) could monitor and address congressional concerns about overvaluation and other aspects of claimed charitable contribution deductions. The submission of the information is prerequisite to petitioners' entitlement to a charitable contribution deduction. Petitioners' failure to substantially comply or otherwise provide respondent with sufficient information to accomplish the statutory purpose compels our conclusion that respondent properly disallowed petitioners' claimed noncash charitable contribution deductions.[4]

Section 183 Activities

Rance and Zane each claimed losses that respondent disallowed as being from activities not engaged in for profit within the meaning of section 183. If an individual engages in an activity but does not engage in that activity for profit, "no deduction attributable to such activity shall be allowed under this chapter except as provided in * * * [section 183]." Sec. 183(a). Section 183(b)(1) permits deductions which are otherwise

_____

[4] Our holding that petitioners are not entitled to the noncash charitable contribution deduction renders it unnecessary to decide the value of the contributed interests.

allowable without regard to whether the activity is engaged in for profit, and section 183(b)(2) permits deductions which would be allowable if such activity were engaged in for profit, but only to the extent the gross income derived from the activity exceeds the deductions allowable by reason of section 183(b)(1). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

In order for a deduction to be allowed under section 162 or section 212(1) or (2), the taxpayer must establish that he "engaged in the activity with 'the predominant, primary or principal objective' of realizing an economic profit independent of tax savings." Giles v. Commissioner, T.C. Memo. 2006-15 (quoting Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212); see Patin v. Commissioner, 88 T.C. 1086 (1987), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1989).

Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d

1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent.  Engdahl v. Commissioner, 72 T.C. 659, 666 (1979).

Factors to be considered in determining whether an activity is engaged in for profit include:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation.  All facts and circumstances are to be taken into account and no single factor or group of factors is determinative.  Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726-727 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.

We consider each of Rance's and Zane's activities separately, beginning with petitioner Rance's activity involving cutting horses.

Rance's Cutting Horse Activity

Schedules F were attached to Rance's 1998 through 2005 income tax returns with his activity described as "crop livestock". At trial the evidence offered was Rance's testimony about his activity, but no documentary evidence (i.e., records) was offered in support of the income and deduction entries on the Schedules F. Rance explained that his profit motivation was based on his goal that one of his horses could turn out to be a "Triple Crown winner" who could earn him income in excess of the losses claimed from the activity.

Rance's testimony about his cutting horse activity was, in great part, lacking in specifics.[5] He discussed horse bloodlines but failed to indicate much about his horses, such as the year and cost of purchase, the training regimen, the events entered, purses and competitions won, breeding efforts, profit analyses, business plans, necessity of expenses, sale price, and so forth. Accordingly, we are left with the task of analyzing Rance's cutting horse activity using his testimony and the Schedules F attached to his income tax returns.

Rance and LaRhea had purchased 70 acres of land in southern Oregon in 1996 and moved to the property late in 1999 after

---

[5] For example, Rance testified about a $17,000 breeding fee and a mare he sold for $35,000. The tax returns in the record (1998 through 2005) do not appear to reflect these events or activity. In addition, Rance testified that he had as many as 20 horses. The Schedules F, likewise, do not reflect that level of activity.

constructing a house and other buildings.  Beginning in 1998, Rance and LaRhea claimed farm losses pertaining to the Oregon property for an activity described as "crop livestock".  The primary expenses claimed for 1998 were depreciation, repairs, and plans; there was no income for that year.  The specifics of the claimed expenses for 1998 have not been detailed or adequately explained.

In 1999, Rance purchased P.K., a driving horse; Popcorn, a Royal Dartmoor pony mare in foal; and Leo, a western pleasure mule.  He subsequently acquired Jewels, which was later traded for Mitzi and I Gotta Lotta; none of these horses were entered in competitions.  Mitzi was sold for $6,300 and I Gotta Lotta for $6,000.  No information was offered as to how these horses fit into Rance's business plan, which he stated involved cutting horses.

Dual Docs was purchased in 2001 for $30,000 and was the first horse entered into competition.  During 2001 and 2002, Dual Docs was in training in Medford, Oregon, with Bobby and Jolene Nelson.  He was sold at a loss in 2004.  This generic information is, in essence, all the record offers regarding Dual Docs.

The following is an analysis of Rance's cutting horse activity using the nine factors as a guide.

1.  <u>Manner in Which the Activity Is Conducted</u>--The fact that a taxpayer carries on the activity in a businesslike manner and

maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.

Essentially, Rance's only record of his activity was a bank account that, for early years, was not segregated from his personal checking account.  No other records were produced with respect to his cutting horse activity.   No records corroborating his testimony were produced to show the horses purchased or their progress and profitability.  In particular, no formal business plan, budgets, operating statements, or analysis was produced to show the financial management or planning of the activity.  Although Rance testified that he had detailed written business plans broken down by horse, such plans were not offered into evidence, and little detail of the plans was described in the testimony.[6]

At trial, Rance was unable to provide detail about the collective deductions claimed on the Schedules F.  The returns were prepared by Mr. Kramer, who used the checkbook to prepare the Schedules F.  Someone with the intent to make a profit from cutting horses could be expected to have adequate information

---

[6] Petitioners attempted to address their failure to present detailed evidence by contending that respondent did not question the substantiation or underlying records during the audit examination.  That, however, does not relieve them of the burden of showing that they met the requirements of sec. 183.  They also attempted to parlay that same contention into a situation where the burden of proof would be shifted to respondent under sec. 7491(a).  We found that attempt to be untimely and in other respects ill conceived.

from which to analyze the expenses and to project the progress of the activity. The activity was for the most part undocumented and there was little or no interest shown in the financial aspect of the activity or its prospects. See, e.g., Rinehart v. Commissioner, T.C. Memo. 2002-9.

In addition, no effort was made to explain how the expenses claimed on the returns related to the activity. There was no explanation regarding how the assets being depreciated or the totality of expenses comported with the needs of the activity conducted. Respondent also points out that the cutting horses lived with trainers and that it was, therefore, less clear how all the expenses associated with Rance and LaRhea's Oregon acreage pertain to this activity. One of the most important indications of whether an activity is being performed in a businesslike manner is whether the taxpayer implements some method for controlling losses. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. No such explanation was provided in this case.

This factor favors respondent and reflects that Rance did not operate this activity in a businesslike manner.

2. Taxpayer's Expertise--A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs.

Rance was generally knowledgeable about cutting horses and had experience in riding, breeding, and caring for these animals. Rance consulted with numerous experts; however, he did not detail the specific advice received or how he employed that advice in the activity. He sought no professional advice on the economics of the cutting horse activity. He did, however, seek advice about the tax aspects and ways to avoid classification of the activity as a hobby. Rance did seek guidance and advice from others, but he failed to explain how the advice he obtained was used or how it assisted in the attempt to seek profits from the activity. However, this factor favors Rance and LaRhea.

3. <u>Time and Effort Spent in Conducting the Activity</u>--The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs.

Rance spent 8 to 10 hours a week on this activity. His involvement with cutting horses provided a recreational benefit. The record is sparse, however, on the specifics of Rance's involvement in this activity. Accordingly, this factor favors respondent's determination.

4. <u>Expectation That the Assets Will Appreciate in Value</u>-- The taxpayer's expectation that the assets used in the activity may appreciate in value may, under certain circumstances,

indicate a profit motive.  Sec. 1.183-2(b)(4), Income Tax Regs. Clearly, it was Rance's expectation that the value of his horses would increase and, in two instances, the values did increase by small amounts.  In addition, he held approximately 75 acres of pasture land which could appreciate.  It is also necessary, however, that the objective be to realize a profit on the entire operation.  Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).  In order for Rance to recoup the losses claimed through the years in issue, future earnings and/or appreciation would have to be considerable.  A champion horse could appreciate substantially, but the likelihood of producing a champion is small.  Overall, we find that this factor favors respondent's determination.

5.  Taxpayer's Success in Similar or Dissimilar Activities--Even if an activity is unprofitable, the fact that a taxpayer has previously converted similar activities from unprofitable to profitable enterprises may be an indication of a profit motive with respect to the current activity.  Sec. 1.183-2(b)(5), Income Tax Regs.  Rance had experience from a previous cutting horse activity but abandoned it because he could not afford it. Rance testified that, in his previous cutting horse activity, one of his horses won a championship.  He did not testify or show that the appreciation in the assets in the earlier activity resulted in overall profits or the amount of losses recouped.

In comparison to the cutting horse activity, Rance and LaRhea have been highly successful in the operation of Beneco. Rance did not explain or show how his business acumen and experience were used in the cutting horse activity. See Smith v. Commissioner, T.C. Memo. 1997-503, affd. without published opinion 182 F.3d 927 (9th Cir. 1999). Accordingly, this factor favors respondent's determination.

6. The Activity's History of Income and/or Losses--An important consideration is the taxpayer's history of income and/or losses related to the activity. Losses continuing beyond the period customarily required to make an activity profitable, if not explained, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.

As of the end of 2001, Rance had incurred nearly $350,000 in losses from his Schedule F activity. By the end of 2005, the claimed losses totaled more than $568,000. These continuing losses were used to offset Rance and LaRhea's ample income from other pursuits, including their involvement in Beneco. The amount of income in relation to the increasing and accumulating expenses or losses does not show that Rance had a profit motive with respect to this activity other than the outside possibility of his breeding or acquiring a champion. See Burger v. Commissioner, 809 F.2d at 360. Accordingly, this factor is unfavorable for Rance and LaRhea.

7. <u>Amount of Occasional Profits</u>--The amount and frequency of occasional profits earned from the activity may also be indicative of a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Rance contends that he sold horses during the years in issue where the price exceeded the original cost. The amounts of gain from those sales, however, were minimal ($839 and $230). Moreover, Rance did not report any overall profits from the activity. In other words, there was no showing of profit when considering the overhead, depreciation, etc. The record reflects continual and overwhelming losses. Accordingly, this factor is unfavorable for Rance and LaRhea.

8. <u>Financial Status of the Taxpayer</u>--Substantial income from sources other than the activity, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit. This is especially true where there are personal or recreational elements involved. Sec. 1.183-2(b)(8), Income Tax Regs.

Without counting any farm income Rance and LaRhea had combined gross income (before taking into account a disputed and conceded income issue involving offshore deferred compensation) of $376,439, $421,563, $644,620, and $1,664,811 for the years 1998, 1999, 2000, and 2001. By 2005, Rance and LaRhea's gross income was $2,739,845, without considering the cutting horse activity. They see this scenario as one that shows that they had the resources to effectively operate the cutting horse activity

which is admittedly capital intensive.  Conversely, respondent contends that the continued losses in the cutting horse activity were intended and used for a tax benefit by means of an offset to Rance and LaRhea's income.  Considering the record as a whole, it appears that the potential for tax benefits attributable to the claimed losses from the activity was substantial.  Considering the fact that this was also a recreational activity, this factor favors respondent's determination.

9.  Elements of Personal Pleasure--The presence of personal motives, particularly when there are recreational elements involved, may indicate that the activity is not engaged in for profit.  Sec. 1.183-2(b)(9), Income Tax Regs.  Respondent points out that Rance has been riding horses most of his life and enjoyed his involvement with his cutting horse activities.  He rode horses in some competitions and had reentered the activity because he enjoyed it and could afford it.

Rance contends that he was interested in the business challenges and derived no personal pleasure from his involvement in the activity.  Rance admits that he enjoyed the activity, but that his focus was winning competitions and producing a champion. Here, again, the continuing losses without any apparent effort to cut costs would tend to indicate a focus on the recreational nature of the activity.  Overall, this factor is unfavorable to Rance and LaRhea.

Our analysis of the nine factors reveals that, overall, Rance did not enter into or continue his cutting horse activity with the requisite profit motive. We hold that respondent's determination disallowing the losses from that activity was not in error.

### Zane's Staffordshire Bull Terrier Activity

Zane became interested in dogs when he was 12 years old, after attending a dog show. Thereafter, his parents bought him his first Staffordshire Bull Terrier.[7] He became involved in dog showing, breeding, and judging, and by 1985, at age 22, he served as the youngest championship show judge in recent history. During the years in issue he attended many dog shows and owned or coowned as many as 30 to 40 dogs. Most of the dogs lived with their handlers or with his coowners.

Zane believed that showing or judging dogs at shows did not normally generate revenue, but breeding and selling puppies could have potential for revenue. More revenue would result if his dogs showed well and/or won medals at a show. Zane has semen stored from two of his dogs. He testified that a breeding typically requires two straws of semen and he could charge around $2,000 per breeding. He estimated that the 80 straws he had at

---

[7] Ultimately, Zane became a noted expert in American and Staffordshire Bull Terriers.

the time of trial would be worth $80,000.[8]  Zane was particular about breeding his dogs, and he would breed his dogs only with high-quality dogs.

At the time of trial, Zane was selling Terrier puppies for amounts ranging from $1,500 to $2,000.  No information was provided, however, as to the selling price for puppies during the years at issue.  Zane believed that one of his dogs was worth $50,000, although no evidence, other than his testimony, was offered to support his belief.

1.  <u>Manner in Which the Activity Is Conducted</u>--Zane did not maintain a separate bank account for his dog activities, and no other records of this activity were produced.  For example, there were no records showing:  Purchase of dogs; financial analysis of their potential for profitability; formal business plan, budgets, operating statements, and analyses of cost control.  Zane did not calculate the amount of income he would need to recover the losses incurred, and he did not predict when the activity might become profitable.  He did, however, invest a substantial amount in the training and showing of Terriers worldwide in order to document their quality.

---

[8] Because multiple straws are needed for an insemination, the number of possible inseminations would be reduced by some mathematical factor.  One report in the record indicated that approximately 7.9 straws was the factor.  If that were correct, 80 straws would result in approximately 10 inseminations for total revenue of approximately $20,000.

Beginning in 1998 and extending through 2003, Zane filed one Schedule F each year designating the activity as "Cattle Crops-- Dog Breeding." In 2004, he simply included the dog breeding activity expenses in a Schedule F labeled "Cattle Crops--Dog Breeding", and a separate Schedule F was attached and designated "Organic Dairy Farm".

Zane's lack of records and failure to address and/or be particularly concerned about the financial aspects and the potential for recouping losses show that he did not operate the activity in a businesslike manner. Someone with the intent to make a profit from dogs would be expected to have a substantial file on each dog. See, e.g., Rinehart v. Commissioner, T.C. Memo. 2002-9. The lack of detailed records as to which dogs were profitable and which were not is an indication that the dog breeding activity was not carried on for profit. See Smith v. Commissioner, T.C. Memo. 1997-503.

Zane made no effort to reduce costs and control losses. Although he contends that his coownership arrangements helped to reduce expenses, any such reduction was insufficient to stem the increasing overall amount of expenses and the increasing losses. He did not earn any income from judging during the years at issue and has earned relatively nominal amounts from showing dogs. Zane's income tax returns reflect no income from the dog breeding

activity for 1997 through 2000 and only nominal amounts thereafter.  This factor is not favorable for Zane.

2.  Taxpayer's Expertise--Zane is a noted longtime expert in judging, showing, and breeding American Staffordshire Terriers and Staffordshire Bull Terriers.  Accordingly, this factor favors Zane.

3.  Time and Effort Spent Conducting the Activity--Zane testified that he spent an average of 10 to 12 hours per week on the dog breeding activity.  He also testified that he spent 20 to 30 hours per week on the dairy farming, along with working full time (presumably at least 40 hours per week) at Beneco.  Zane also testified about spending time in charitable activities.  It appears that he was spread thin and that his estimates of hours may be overstated.  Overall, however, this factor favors Zane.

4.  Expectation That the Assets Will Appreciate in Value-- Zane believed that one of the dogs was worth $50,000, but he failed to corroborate his belief.  In addition, he did not specify whether the dog was solely owned or coowned.  If we were to assume that Zane's belief was correct and that he was the sole owner, the $50,000 would not be sufficient to recoup the $275,000 in losses already incurred by 2001.  Zane also had potential to earn revenue from insemination (breeding) and the sale of puppies.  The difficultly here is the lack of documentation and/or corroboration supporting Zane's contention.  The income

reported through the taxable years in question does not reflect the potential to recoup the claimed losses as Zane contends. Accordingly, we find this factor to be unfavorable for Zane.

5. <u>Taxpayer's Success in Similar or Dissimilar Activities</u>-- In addition to his dog breeding activity, Zane operated a cattle activity that had reported losses. On the other hand, Zane was vice president of Beneco--a very successful business operated by Zane and his family. He did not show that the experience or success from Beneco was carried over into his dog breeding activity. For example, there were inadequate records of the activity. There was no showing that his acquired business techniques were used to cut costs or improve receipts. Accordingly, this factor is not favorable to Zane.

6. <u>The Activity's History of Income and/or Losses</u>--By the end of 2001, Zane had accumulated losses in an amount approaching $275,000. By 2004, his losses were approaching $340,000. These losses were used to offset Zane and Shannon's other substantial income. The amount of losses in comparison with revenues does not show, however, that Zane intended to cut losses or improve the potential for gain. Although Zane contends that the potential to recoup the losses and show gain existed, the record does not support his contention. Accordingly, this factor is unfavorable for Zane.

7. <u>Amount of Occasional Profits</u>--No profits and only limited receipts have been reported from Zane's dog breeding activity. This factor is unfavorable for Zane.

8. <u>Financial Status of the Taxpayer</u>--Zane and Shannon's gross income, without considering income adjustments they conceded, was $382,020, $277,979, $320,569, and $718,466 for the 1998, 1999, 2000, and 2001 years. For each of the next 3 years, their income exceeded $700,000 annually. The potential for tax benefits from the claimed dog breeding activity losses was substantial. This factor favors respondent's determination.

9. <u>Elements of Personal Pleasure</u>--There is no question about the pleasure Zane derived from his involvement in the dog breeding activity. He has been involved with dogs since he was 12 years old and enjoyed judging shows and has had the opportunity to travel all over the world. It is noted that his judging was not compensated and that he traveled at his own expense and that the travel expenses have been deducted. He was an acknowledged expert concerning Staffordshire Bull Terriers and American Staffordshire Terriers worldwide.

Considering all of the above-discussed factors and the record as a whole, it appears that Zane's dog breeding activity was one of personal interest and more of a hobby than a business. It was the participation in showing and judging terriers that attracted him to the activity and not the profit objective. It

is noted that expenses for travel, shows, and boarding dogs were substantial.

Accordingly, we hold that Zane did not enter into or continue the dog breeding activity with the requisite profit motive for the years before the Court.

Zane's Cow and Dairy Farm Activity

Zane and Shannon argued on brief that Zane's dog breeding and cow and dairy farm activities were one activity and that the cow and dairy farm activity was an expansion or extension of the dog breeding activity. That argument was made, to some extent, to make the point that Zane went into the cow and dairy farm activity to help remedy or recoup some of the losses experienced in the dog breeding activity. It was also contended that some of his expertise in breeding dogs carried over into the breeding of cows.

Section 1.183-1(d), Income Tax Regs., provides the appropriate legal standard for determining whether two or more activities constitute one or two activities. A "facts and circumstances" standard is prescribed to ascertain whether the activities are separate. "Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings". Sec. 1.183-1(d)(1), Income Tax Regs.

In this instance, there was no organizational or economic interrelationship between the two activities.  Other than the reporting of the expenses of both on the same Schedule F, the activities were geographically and financially independent.  No business purpose was expressed other than Zane's ability to use his knowledge of dog breeding in cow breeding.  The use of that experience and knowledge by Zane is not, per se, a business purpose and did not result in any economy of scale or symbiosis between the two activities.

The cow and dairy farm activity was a separate pursuit.  We treat the dog breeding activity and the cow and dairy farm activity as separate for purposes of our section 183 analysis.

Beginning in 1998, Zane claimed losses on Schedule F from his cow and dairy farm activity which he reported along with those of his dog breeding activity and described as "cattle crops--dog breeding".  Subsequently, in 2001 he described the activity as "organic dairy farm" on his Schedule F.

Respondent contends that Zane did not effectively enter into the cow and dairy farm activity until 2001, whereas Zane contends that the early activity involving the cattle was preliminary to and an integral part of the expansion of that activity in 2001. In 1998, Zane purchased a 400-acre farm, (Goose Hill), in upstate New York where he also built his home.  His Schedule F for the

1999 tax year reflects that other than depreciation and repairs of the property, most of the expenditures were for the dog breeding activity, including dog training and showing. No expenses were claimed that appeared to relate directly to the cow and dairy farm activity. Likewise, for the 2000 tax year most were for the dog breeding activity, and only a relatively small portion could have been connected with the cow and dairy farm activity.

For 2001 two Schedules F were included, and the one labeled "Cattle Crops--Dog Breeding" contained substantially increased expenditures. Relatively large amounts were spent on items relating to cows such as feed and trucking expenses. The second Schedule F was labeled "Organic Dairy Farm" and contained claimed expenditures and depreciation totaling $98,470. These circumstances reflect that Zane did not begin to pursue the dairy farm idea until 2001. Any expenditures nominally connected with cows before 2001 would have, in any event, been considered startup expenditures (which are to be capitalized) and were incurred before the implementation of the plan to pursue the dairy farm. See Toth v. Commissioner, 128 T.C. 1, 4-6 (2007). Accordingly, we agree with respondent that Zane and Shannon are not entitled to claim any losses in connection with his cow activity before 2001.

With respect to 2001, Zane had studied and researched the various types of cattle that could be bred. Zane recognized that

family dairy farms were not doing well, and he decided that to be profitable, he had to find for his farm a niche in the market that would let it compete as to product and price.  After much research he decided to raise Normande cattle.  The dairy farm idea had materialized and was operational by the end of 2001 and accordingly expenditures would not be considered to be startup expenses.

During 2000, Zane purchased 225 additional acres of farmland nearby and called it the Columbus Dairy.  The Columbus Dairy became the organic dairy farm.  At the Columbus Dairy, Zane built a milking parlor and other buildings for the milking operation. Zane also reclaimed the pastureland and built miles of fencing for the organic dairy operations on the Columbus Dairy property. Milking started sometime in 2002.

Normande cows are good producers of milk in France but are largely used for beef consumption in the United States.  After visiting many farmers and ranchers throughout the United States, Zane acquired a herd of Normande cows that he believed would be the best milk producers.  He intended to further breed the acquired herd so his activity could become competitive in the dairy farming industry.  Zane had a 7-year business plan involving the importation of bull semen from France, as he could not import Normande cows to breed with his cows to produce more and better milk.  At the same time, Zane was working to convert his land from a conventional to a certified organic farm.  Zane

believed that if his farm could be certified as organic, he would be able to sell the milk at a price three times that of conventional milk.

By the time of trial, Zane's animal breeding was progressing, and the farm was certified organic in 2006. His gross revenues exceeded $100,000 for 2004, 2005, and 2006. Zane expects the revenue to triple in 2007 because of the organic certification. In operating this activity, Zane has consulted with experts, done marketing, maintained separate checking account records, and focused on ways to maximize revenue.

The following is an analysis of the nine factors, more fully described above, as applicable to this activity.

1. Manner in Which the Activity Is Conducted--Zane physically segregated the cow activity from the dog breeding activity and, as of 2001, maintained a separate bank account for the cow activity. He had a formal 7-year business plan that he pursued throughout the years in issue. He took steps to maximize his revenues and continually worked to show a profit.

Although for years before 2001 Zane reported the dog breeding activity and the cow and dairy farm activity on a single Schedule F, the activities were separately pursued and had differing operations. Beginning around 2001, Zane hired Mr. Hughes to be his farm manager. He gave him a place to live, the use of a truck, and cash wages of around $30,000 per year. Although Zane did not keep many formal records, he did approach

the operation of the cow activity in a businesslike manner. Accordingly, this factor is favorable for Zane.

2.  Taxpayer's Expertise--Through study, Zane gained expertise in the breeding of cows and in the use of Normande cows for dairy purposes.  He sought professional advice and successfully used in the cow activity his animal husbandry expertise gained from breeding dogs.  Overall, this factor is favorable for Zane.

3.  Time and Effort Spent in Conducting the Activity--Zane spent an average of 20 to 30 hours per week on his cow and dairy farm activity.  Certainly, 20 to 30 hours per week is significant.  Accordingly, this factor favors Zane.

4.  Expectation That the Assets Will Appreciate in Value-- The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity.  Sec. 1.183-2(b)(4), Income Tax Regs.  Respondent contends:

> farming and the holding of land with the primary intent to profit from an increase in its value will be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value.  That is, they will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land.

Zane has two separate farms, one in Hamilton, New York (Goose Hill), with approximately 400 acres purchased in 1998 for $600 to $650 per acre and currently worth around $2,500 per acre

on the basis of comparable sales of farm land, and another farm with 225 acres (Columbus Dairy) which was purchased in 2000 for $500 to $600 per acre and is currently worth around $1,200 to $1,500 per acre on the basis of comparable land sales.

Although we do not consider the land appreciation and the cow and dairy farm activity as a single activity, we recognize that Zane's investment in the land and buildings also has the potential for appreciation and profit.  On that basis, we find this factor to be favorable to Zane.

5.  Taxpayer's Success in Similar or Dissimilar Activities-- Zane operated the dog breeding activity at a loss before entering the cow and dairy farm activity.  Although Zane was not financially successful in the dog breeding activity, he was successful in gaining expertise in animal husbandry and related topics involving the care and breeding of animals.  Beneco is a successful business operated by Zane and his family.  We discern that Zane has employed some of the success of other endeavors in his cow activity and, accordingly, this factor is favorable to Zane.

6.  The Activity's History of Income and/or Losses--By the end of 2001, Zane's accumulated losses from the cow activity approached $153,000.  Although the total losses had increased to approximately $307,000 by 2003, the last year for which a Schedule F was available, the potential for increased revenues

from the sale of organic milk could address the deficit. Accordingly, we find this factor to be neutral.

7. <u>Amount of Occasional Profits</u>--Zane has not reported any profits from the cow activity, and therefore this factor is unfavorable for Zane.

8. <u>Financial Status of the Taxpayer</u>--Without counting any farm income Zane and Shannon's gross income, before considering income adjustments they conceded, was $382,020, $277,979, $320,569, and $718,466 for the years 1998, 1999, 2000, and 2001. For each of the next 3 years, their income exceeded $700,000. That level of income provided the potential for substantial tax benefits from the claimed losses from the cow and dairy farm activity. Therefore, this factor is unfavorable for Zane and Shannon.

9. <u>Elements of Personal Pleasure</u>--Although Zane has a keen interest in cows, especially the Normande breed, his focus in this activity has been to seek a profit from a dairy operation. We note that the Normande breed was not traditionally used for dairy purposes in the United States. However, Zane believed that they had great potential for high quality and quantity production. Unlike the dog breeding activity, we find that Zane's interest in the cow and dairy farm activity was more business and less pleasure oriented.

Overall, we hold that Zane has established that he entered into the cow and dairy farm activity in 2001 with the requisite profit motive within the meaning of section 183.

Whether Petitioners Are Liable for Penalties Under Section 6662 for Each Adjustment Considered by the Court for the Taxable Years 1998, 1999, 2000, and 2001

Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment of tax required to be shown on a return. The penalty is applicable to the portion of any underpayment attributable to one or more of the following: (1) Negligence or disregard of rules or regulations; (2) any substantial understatement of income tax, and (3) any substantial valuation misstatement. Sec. 6662(b).

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of title 26, and "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation. Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Negligence includes any failure to exercise ordinary and reasonable care in the preparation of a tax return, but it does not include a return position that has a reasonable basis. Sec. 1.6662-3(b)(1), Income Tax Regs. Reasonable basis is a relatively high standard of tax reporting, significantly higher than not frivolous or not patently improper. It is not satisfied

by a return position that is merely arguable. Sec. 1.6662-3(b)(3), Income Tax Regs.

Negligence may be indicated when a taxpayer fails to ascertain the correctness of an item on the return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. A substantial understatement of income tax is defined as an understatement of income tax that exceeds the greater of 10 percent of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A).

As already discussed, the Commissioner bears the burden of production in any court proceeding with respect to the penalty, addition to tax, or additional amount imposed by title 26. Sec. 7491(c). The burden imposed on the Commissioner is to come forward with sufficient evidence regarding the appropriateness of applying a particular addition to tax or penalty against the taxpayer. Wheeler v. Commissioner, 127 T.C. 200 (2006); Higbee v. Commissioner, 116 T.C. 438 (2001). Section 7491(c) does not, however, require the Commissioner to introduce evidence of reasonable cause, substantial authority, or similar provisions.

Section 6664 provides an exception to the imposition of accuracy-related penalties if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. Sec. 6664(c); United States v. Boyle, 469 U.S. 241 (1985). Whether a taxpayer acted with reasonable cause and

in good faith is a factual question. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor in determining whether a taxpayer acted with reasonable cause and in good faith is the extent to which the taxpayer exercised ordinary business care and prudence in attempting to assess his or her proper tax liability. Id. Reasonable cause may, in some cases, be established by reliance on the advice of a professional tax adviser. Id. Sec. 1.6664-4(b), Income Tax Regs. In order for the taxpayer to establish that he reasonably relied upon advice, he must prove by a preponderance of the evidence that (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Although honest misunderstanding of fact or law could be reasonable, petitioners are required to take reasonable steps to determine the law and to comply with it. See Niedringhaus v. Commissioner, 99 T.C. 202 (1992). In the end, the duty of filing accurate returns lies with petitioners, who must bear the ultimate responsibility for any negligent errors of their agent. See Pritchett v. Commissioner, 63 T.C. 149, 174 (1974).

Petitioners generally contend that they had hired tax professionals to advise them on their various activities,

deductions, and return reporting and that they appropriately followed the advice and return reporting positions of those professionals. Respondent, however, sees petitioners as sophisticated and successful business people who understand complex legal concepts in connection their Beneco business. Respondent contends that petitioners should have known that the positions they took on their returns were incorrect.

Respondent also points out that petitioners have conceded their offshore leasing issue and the penalties determined with respect to it and that those transactions reflected that petitioners had a high tolerance for risk in their tax reporting. In essence, respondent argues that petitioners were willing to take aggressive tax reporting positions and that we should consider that in evaluating petitioners' other deductions and reporting positions.

Petitioners claim to have relied upon their accountants for the contribution and section 183 loss issues. Mr. Kramer prepared petitioners' returns for the years 1998 through 2001. Petitioners each testified that they relied upon Mr. Kramer to properly prepare their returns.

Petitioners' Accuracy-Related Penalties for Their Noncash Charitable Contribution Adjustments for the 1998, 1999, 2000, and 2001 Tax Years

Each couple conceded that they are liable for the accuracy-related penalties with respect to their offshore leasing transactions, a matter which affected their liabilities for

several taxable years. We must decide whether petitioners are liable for the accuracy-related penalties with respect to the noncash charitable contribution deductions.

Beginning in the mid-1990s and for various years through 2001, petitioners claimed deductions for noncash charitable contributions. Respondent determined that they are not entitled to the deductions because they failed to supply the information required by the statute and regulations, and we have so held.[9] Respondent contends that petitioners knew that they had not supplied the required information--i.e., that the appraisals valued Beneco stock rather than the limited partnership interests and that the appraisals submitted were not timely as required by the statute. Amongst other errors in reporting the noncash charitable contributions, the percentages of ownership were misstated, the C.P.A. signed the appraiser's name, and reference was made to an appraisal with a particular date which has not been shown to exist. Respondent contends that no reasonably prudent person would have allowed these errors to persist year after year.

---

[9] Respondent also questioned whether the values of the limited partnership interests or the amounts of the claimed contributions were overstated. We have not addressed the value question because we have sustained respondent's determination that petitioners are not entitled to any deduction because they failed to provide information required by the statute and the regulations.

Petitioners do not dispute the errors on their tax returns with respect to the noncash charitable contributions. They acknowledge that the appraisals of the donated property were not "qualified appraisals" as required by the regulations; that none of the appraisals was made within 60 days of the contribution of the partnership interest; that Mr. Kramer (C.P.A.) and Rick Brewster (Mr. Brewster) (C.P.A.) each decided not to value the partnership interests (i.e., the property donated), but decided to value the only asset of the partnerships (the Beneco stock). Petitioners contend that these errors or omissions do not, ipso facto, make them liable for penalties and that the issue is simply whether they reasonably relied on the professionals they hired--Attorney Kelley, experienced in estate and tax planning; Mr. Kramer, an experienced C.P.A. practicing in the tax field for over 35 years; and Mr. Brewster, an experienced C.P.A. practicing in the tax field for over 25 years--to provide them proper tax advice and to properly prepare their tax returns.

The penalty under section 6662 is not imposed with respect to any portion of any underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. A taxpayer's reliance on the advice of an independent professional as to the tax treatment of an item, if such reliance was reasonable and the taxpayer acted in good faith, will establish that the taxpayer

was not negligent and will satisfy the reasonable cause exception. Sec. 6664(c); sec. 1.6664-4(b), Income Tax Regs.

The general rule is that a taxpayer has a duty to file a complete and accurate tax return and cannot avoid that duty merely by placing that responsibility with an agent. United States v. Boyle, 469 U.S. at 252; Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). In certain limited situations, the good faith reliance on the advice of an independent, competent professional in the preparation of the tax return can satisfy the reasonable cause and good faith exception. United States v. Boyle, supra at 250-251; Weis v. Commissioner, 94 T.C. 473, 487 (1990). Reliance on the advice of a professional tax adviser, however, does not automatically demonstrate reasonable cause and good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. All of the facts and circumstances must be taken into account. Sec. 1.6664-4(c)(1), Income Tax Regs. The advice must be based upon all pertinent facts and the applicable law. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. The advice must not be based on unreasonable factual or legal assumptions. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs. The advice cannot be based on an assumption that the taxpayer knows, or has reason to know, is unlikely to be true. Id.

In order to show reasonable reliance the taxpayer must prove: (1) The adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him;

(2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Weis v. Commissioner, supra at 487 (citing Pessin v. Commissioner, 59 T.C. 473, 489 (1972)).

The gist of the disallowance of petitioners' noncash charitable contribution deductions was their failure to comply with certain statutorily specified procedural requirements that were intended to enable respondent to monitor such deductions. Petitioners relied on their tax professionals to properly report the charitable contribution deductions. The Court's holding on this issue was based on these procedural failures.

Petitioners' C.P.A., Mr. Kramer, has been licensed since 1967, and he prepared tax returns and gave tax advice for a living. He prepared approximately 1,000 tax returns each year. Mr. Kramer, in addition to preparing petitioners' returns, also provides tax and consulting advice for petitioners and their corporation, Beneco. Mr. Kramer advised petitioners with respect to the noncash charitable contributions that they may have made in 1998, 1999, 2000 and 2001, and he was aware that they were relying on his advice. He also prepared petitioners' tax returns for the years at issue, making certain necessary recommendations as to obtaining an appraisal, when to get the appraisal, and what type of appraisal to obtain. He was not instructed by any of petitioners on how to do his job or how to value the partnership interests that were donated. Mr. Kramer instructed petitioners

regarding all of the requirements, and he was responsible to properly report the contributions on their returns.

Mr. Kramer also made the appraisal for the early years at issue by appraising the Beneco stock. Petitioners relied on Mr. Kramer as their C.P.A. and for the necessary appraisals with respect to the partnership interests contributed for their 1998 through 2001 tax years. Mr. Kramer testified that he believed he was familiar with section 170 reporting requirements for noncash charitable contributions and with the Form 8283 used to report noncash charitable contributions. Mr. Kramer recognized that it was his responsibility to make sure that the section 170 reporting requirements for the noncash charitable contributions were met when he completed the tax returns for the years at issue. Mr. Kramer stated that he made a good-faith effort to comply with the section 170 reporting requirements. The record reflects that his efforts fell far short of the requirements.

Around 1999 or 2000, Mr. Kramer advised petitioners to obtain a certified appraisal, and he recommended that they hire Mr. Koehl, a certified appraiser. Mr. Kramer hired Mr. Koehl, on petitioners' behalf, to appraise the partnership interests. Mr. Koehl made the independent decision to value only the Beneco stock.

Accordingly, petitioners have shown that they had every reason to believe that their adviser was a competent professional with sufficient expertise to justify their reliance on him.

There is no question whether petitioners provided necessary and accurate information to their tax professional.  Finally, we find that petitioners relied in good faith on the adviser's judgment and had good reason to do so.  It was solely the actions of petitioners' tax professional that caused petitioners' failure to meet the procedural requisites for their noncash charitable contributions.[10]  Under these circumstances, we hold that petitioners had reasonable cause and are not liable for the section 6662 penalty with respect to the disallowed noncash charitable contribution deductions.

Whether Rance and LaRhea Are Liable for a Section 6662 Penalty With Respect to Their Disallowed Schedule F Losses

Respondent argues that Rance and LaRhea were negligent in claiming Schedule F losses in each of the taxable years before the Court.  In support of his argument, respondent points out that Rance described the activity as "crop livestock" on the Schedule F, whereas at trial it was described as a cutting horse activity.  Respondent also points to the failure to keep business records, other than a commingled bank checking account.  See sec. 1.6662-3(b)(1), Income Tax Regs.

---

[10] We see a difference and a distinction between reliance for procedural as opposed to substantive aspects or tax reporting.  Petitioners followed the advice and guidance of the tax professional and provided him with the information needed to document their contributions.  Petitioners relied on the professional's ample experience and obligation to make sure that the transactions were properly reported, which the professional failed to do.

The Court observed that Rance's interest in the activity focused upon the cutting horses and he was otherwise unfamiliar with and could not identify many of the items claimed on the Schedules F.  There were only minimal amounts of revenue in any of the years at issue, and the losses were unabated and substantial.  The size of the tax losses in relation to the revenue from the activity, combined with Rance's hobbylike involvement in the activity, made the situation one that has been described as "too good to be true" and can readily be construed as a hobby as opposed to an activity where profit was intended. Dodge v. Commissioner, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999); sec. 1.6662-3(b)(1)(ii), Income Tax Regs.  We also note that Rance was advised by Mr. Kramer that he needed more revenue to avoid hobby loss characterization.

Rance's principal argument on this issue is that he relied on his tax professional.  This Schedule F situation is unlike the noncash charitable contribution where petitioners complied with their tax professionals' requests and the failures to properly comply with the procedural requirements were the fault of the tax professionals.  Rance was engaged in the activity, and he is a sophisticated and successful business professional.  Rance was aware of his activities, losses, etc., and his tax professional merely prepared the returns (Schedules F) from the financial information that Rance provided.  The reliance argument is not

available to Rance and LaRhea in this instance.  Accordingly, we hold that Rance and LaRhea were negligent, within the meaning of section 6662, for failure to keep proper books and records and generally for claiming losses from the cutting horse activity.

Whether Zane and Shannon Are Liable for a Section 6662 Penalty With Respect to Their Disallowed Schedule F Losses Claimed With Respect to Their Dog breeding activity and Pre-2001 Cow Activity

Zane and Shannon claimed Schedule F losses in connection with a dog breeding and showing activity for their 1998, 1999, 2000, and 2001 tax years.[11]  Zane claimed substantial losses from his dog showing, breeding, and judging activity even though prospects for revenue were limited and/or remote.  He produced no formal books and records.  The expenses were sometimes combined with those involving the cow and dairy farm activity, making it difficult to evaluate the success or progress of the business.  With no revenue from the dog breeding activity in any of the years at issue, the size of the tax losses from the activity, combined with the substantial enjoyment Zane derived from his involvement with the dogs, resulted in a situation that has been

---

[11] Because Zane was found to be involved in a profit-motivated activity with respect to his 2001 cow and dairy farm activity, no underpayment results and there is no need to consider the parties' arguments with respect to the sec. 6662 penalty regarding that activity.  To the extent that an underpayment is attributable to the cow and dairy farm activity claimed on the Schedule F for 1998, 1999, or 2000, it is considered in conjunction with the substantially dominant dog breeding activity.

described as "too good to be true."  <u>Smith v. Commissioner</u>, T.C. Memo. 1997-503; sec. 1.6662-3(b)(1), Income Tax Regs.

Zane's principal argument on this issue is that he relied on his tax professional.  This Schedule F situation is unlike the one involving the noncash charitable contributions where petitioners complied with their tax professionals' requests and the failure to properly comply with the procedural requirements was the fault of the tax professionals.  Zane was engaged in the activity, and he is a sophisticated and successful business professional.  Zane was aware of his activities, losses, etc., and his tax professional merely prepared the returns (Schedules F) from the financial information that Zane provided.  The reliance argument is not available to Zane and Shannon in this instance.

Accordingly, we hold that Zane and Shannon were negligent, within the meaning of section 6662, for failure to keep proper books and records and generally for claiming Schedule F losses for 1998, 1999, and 2000.

To reflect the foregoing and concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.